than that delivered by the Chief Justice.
M‘Kean, Chief Justice.
This is an action of very considerable importance, not only as it affects the present parties, but as it affects every holder, drawer, or indorsor of a bill of exchange. The honor and justice of the State are, indeed, likewise interested, that the decision should be conformably to the general mercantile law of nations, left a deviation should be imputed to our ignorance, or disrespect, of what is right and proper. It should be remembered too, that the Defendant is a stranger, and that the event of this suit can be no further obligatory elsewhere, than as it corresponds with the universal and established usage of all countries; for, upon the present question, that, and not the local regulations of Pennsylvania, must furnish the rule of determination.
It appears, then, that one Whitelaw, on the 30th of October, 1775, drew a bill of exchange for £ 339. 18. sterling, upon William Houston, malster, and Co. in Refrew, near Glasgow, in favor of James Witherspoon, or order, and payable on the 1st day of August, 1776. This bill, afterwards, but it is not certain at what period, Witherspoon indorsed to Currie the Defendant, who sometime in the year 1777 indorsed it to Messrs. Archibald and John Blair, and those gentlemen, before the month of October, 1778, indorsed it to John Pringle, by whose subsequent indorsement, it became the property of Steinmetz and Bell, the Plaintiffs in this cause. It appears further, that Steinmetz and Bell on the 19th of October, 1778, indorsed the bill of exchange to Mr. Freeman, who is now dead, and by whom, in his life time, it was transmitted to William Cowpland of London. The bill seems to have been speedily and regularly indorsed after it came into the hands of the Plaintiffs; and Cowpland, having duly received it from Mr. Freeman, demanded payment of the persons upon whom it was drawn on the 30th of December, 1778, when it was protested on account of their refusal, for which they assigned *271 reasons, that can have no effect or relation to the cause. The notice of this protest was received by Freeman's executor, William Sitgreaves, on the 13th of April, 1780, and he gave notice to Messrs. Steinmetz and Bell on the 28th of the same month; but those gentlemen did not untill the 16th of October, 1782, give any notice to Currie, the Defendant, who was arrested the day following to answer in this action.
These are the material facts; and, on them, we are not to enquire, how it happened that the bill lay three years, from the time of drawing to the time of protesting it: for, as between indorsor and indorsee, every indorsor is considered as a new drawer. The defence, however, is on this single point, that the Plaintiffs had notice on the 28th of April, 1780, and yet gave none to the Defendant untill the 17th of October, 1782, a period of two years and a half, except twelve days. Whether that was a reasonable time, will depend upon the circumstances of the case. It appears that the Plaintiff lived in Philadelphia, and the Defendant, when he sold the bill, lived at Fishkill in the state of New-York, about 130 miles off. This, in point of distance, is not so great, but that he might have been found, or, at least, some enquiry made after him, much sooner. We are, therefore, unanimously of opinion, that the delay has been unreasonable; but if they have satisfactorily accounted to the Jury for that delay, their verdict will be in favor of the Plaintiffs. Were it, however, before us, on a special verdict, we should certainly determine, that it is an unreasonable time.
It is alledged, that the difficulties of the war prevented the giving notice, and that the Plaintiffs could not bring their action, untill they were in possession of the bill. But is that true? Could not notice be given, nothwithstanding the war? They saw the bill and protest in the hands of Sitgreaves, and they knew they became responsible. It was, therefore, their duty to provide for their indemnification and to give immediate notice. Nor could there be any great difficulty in finding the Defendant, for he appears to have been a man of note, in extensive business, and dealt, at that very time, with Pringle, another indorsor of the bill, who lived in Philadelphia, and from whom information might have been obtained. There is, perhaps, an honest and a reasonable ground for not giving notice until after the 20th of May, 1780, left the money should be paid in depreciated paper. But two years more elapsed, when that danger was over, by the extinguishment of continental money.
It has been said, likewise, that when the drawer has no effects in hands, no notice is necessary; but it has been determined otherwise, as between indorsor and indorsee, upon the clearest principles. What is it to the indorsee whether the drawer has effects or not? Every indorsor is in law a new drawer, and he may be compelled to pay a bill, even where the name of the drawer has been forged. Every day s experience shews that bills are taken on the credit of the indorsor alone—sometimes when the drawer is totally unknown. Nor *272 can it be alledged, that no injury has been sustained, since in the course of things, all the prior indorsors might have failed.
Upon the whole, we think the strength of the evidence is against the Plaintiffs; and if the Jury are of the same opinion, they will find a verdict accordingly. But if, on the contrary, they are satisfied with the reasons given for not making an earlier demand, they will find for them.
The opinion of the Court being so unfavorable to the Plaintiffs, they voluntarily suffered a nonsuit, when the Jury were at the bar ready to return their verdict.
In the course of the Trial, the Plaintiffs offered John Pringle, (their immediate preceeding indorsor) as a witness; and, in order to do away his interest in the action, they proposed striking his name off the first and third bills of the set; which were the only bills in their possession, the second, on which the protest was made, being, as they alledged, lost in its passage from England to America.
It was objected by the Defendant, that Pringle’s name would still remain upon the second bill (which, for any thing that appeared to the contrary, might be in the hands of a third person) and on the records of the notary, who made the protest; so that he could not be effectually discharged in the way proposed.
To this, the Plaintiffs counsel replied, that, where there are several securities for the same thing, a discharge of one is a discharge of the whole; and they instanced the case of a captain of a ship, who usually signs three bills of lading, of the same tenor and date.
But, by the Court: In that case, if the captain takes a receipt, he would certainly be discharged. In the instance before us, however, the second bill may be in the possession of a bona fide purchaser, who will be entitled to sue Pringle upon it, notwithstanding any act of the Plaintiffs on this occasion. We are of opinion, that Pringle is clearly interested in the cause, and, therefore, inadmissible as a witness.
It was suggested, that if the Plaintiffs executed a release to Pringle, he might be made a witness; but Ingersoll, doubting whether a release to one indorsor, would not be a release to all, did not chuse to adopt this measure.
It was also ruled, in this cause, that the case in Term Reports, being a determination upon general mercantile law, was of authority here; and that it would have been so, if it had been determined in France, Spain, or Holland, as well as in England.